STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| City of South Burlington, | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Docket No. 107-5-02 Vtec |
| | } | |
| JAM Golf, LLC, | } | |
| Highlands Development Co., LLC., | } | |
| Fairway Estates Development Corp., | } | |
| Homestead Design, Inc. (dismissed), | } | |
| Robert J. Perry, Esq., Trustee, | } | |
| R & L Taft Building, Inc. (dismissed), | } | |
| Ironwood Real Estate, LLC (dismissed), | } | |
| Defendants. | } | |
| | } | |
| Appeal of Robert J. Perry, Esq., Trustee | } | Docket No. 66-3-02 Vtec |
| | } | |
| Appeal of Robert J. Perry, Esq., Trustee | } | Docket No. 117-5-02 Vtec |
| | } | |
| Appeal of JAM Golf, LLC | } | Docket No. 158-7-02 Vtec |

Decision and Order

The City of South Burlington is represented by Amanda S.E. Lafferty; Defendant-

Appellants JAM Golf, LLC (JAM Golf), Highlands Development Company, LLC (Highlands)

and Robert J. Perry, Esq., as trustee (Trustee) are represented by William Alexander Fead, Esq.  Fairway Estates Development Corp. (Fairway), represented by Guy L. Babb did not take an active role in the trial and did not file requests for findings or memoranda of law. Susan Clark, Helga Whitcomb, and Janice Smith appeared and represented themselves in Docket No. 66-3-02 only, and also did not file separate requests for findings or memoranda of law.

JAM Golf and Highlands are limited liability companies formed by James A. McDonald.  JAM Golf and Highlands are the owners and developers of land known generally as the Vermont National Country Club (VNCC), located on both sides of Dorset Street.  VNCC received approval as a Planned Residential Development, involving an 18-hole golf course and associated clubhouse and other buildings, and various residential neighborhoods or developments.  Highlands and Fairway are the beneficiaries of a title-holding trust for the Economou Farm Road neighborhood or development, which is under contract for sale from Highlands to Fairway.  Robert J. Perry, Esq. is the trustee, with instructions to convey the property to Fairway if the money is paid or to reconvey it back to Highlands if it is not.

Docket No. 66-3-02 Vtec is an appeal from the DRB=s denial of an application to amend the approved site plan to substitute earthen berms placed parallel to Swift Street at Economou Farm Road for the approved rows of trees shown on the approved plans.

Docket No. 117-5-02 Vtec is an appeal from the DRB=s upholding of a Notice of Violation alleging the placement of fill[1] in excess of 20 cubic yards without a permit, at the same location.

Docket No. 107-5-02 Vtec is an enforcement case filed by the City regarding the violations asserted in the Notices of Violation that are the subject of Docket Nos. 117-5-02 Vtec and 158-7-02 Vtec, as well as alleging the placement of fill in excess of 20 cubic yards without a permit regarding what the City characterizes as >berms= along Dorset Street.

Docket No. 158-7-02 Vtec is an appeal from the DRB=s upholding of a Notice of Violation regarding the use of the club house, swimming pool and tennis courts without a certificate of occupancy (certificate of compliance) and the construction of parking lots, access drives and landscaping at the clubhouse contrary to the approved plans.

An evidentiary hearing was held in these matters before Merideth Wright, Environmental Judge, who took a site visit alone after the hearing, by agreement of the

_____

[1]  The present proceedings involve a number of large piles of earth materials which the City claims are permanent shaped mounds of earth material fill (berms) requiring a permit, and which Defendant-Appellants claim are temporary stockpiles authorized to be left in their locations during the prolonged construction of the remaining areas of the entire VNCC project.  As necessary to discuss the legal consequences of these mounds of earth materials, we may use the neutral phrase >mound of earth materials= as opposed to using the terms >stockpile,= >berm,= or >fill.=

parties. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

These cases involve a large development known as the Vermont National Country Club (VNCC), located in the Southeast Quadrant zoning district in the City of South Burlington. VNCC is located on both sides of Dorset Street, an arterial roadway running north to south, and is bounded on the north by Swift Street and on the south by Old Cross Road to the east of Dorset Street and by Nowland Farm Road to the west of Dorset Street. The entire VNCC project involves a golf course, clubhouse, pool, tennis courts and related buildings, as well as variously-named areas or neighborhoods proposed for residential development. It involves approximately 418 acres of land and 296 residential units. The development as a whole received approval as a Planned Residential Development in 1996 and has been revised from time to time over the intervening years, as the golf course improvements and the various residential areas or neighborhoods proceeded to be developed.

As it relates to this litigation, before any houses were built at VNCC, JAM Golf

owned[2] the land permitted as the golf course.  It owns the lands allocated to the clubhouse and its associated buildings and improvements, and the lands of the golf course itself, including those areas on the east side of Dorset Street identified as Golf Course Parcel C, south of the Holbrook-Tabor neighborhood and Golf Course Parcel D, a Y-shaped parcel adjacent to the fairways for the 10th and 18th holes of the golf course.

As it relates to this litigation, before any houses were built at VNCC, Highlands owned the land permitted for residential development (known as AHighlands at the Vermont National Country Club@).  It has entered into contracts on a neighborhood-by-neighborhood basis with various development entities for them to market the property, sell lots to prospective homeowners, and build the houses on the lots; it has not or has not yet sold all the land intended for residential development.  Highlands owns the land known as AResidential Parcel 3" on the east side of Dorset Street, across from the golf club clubhouse; the Old Schoolhouse neighborhood parcel (under contract for sale to Wedgewood Development Company, related to Fairway) to the west of Dorset Street and the north of Nowland Farm Road; and owned the Economou Farm Road neighborhood parcel now held by Trustee (under contract for sale to Fairway), located in the northwest corner of the VNCC development, on the south side of Swift Street.

---

[2]  A small portion of the golf course is on leased land, but it is subject to all of the permits applicable to the golf course.

The zoning permit for phase 1A of the project provided for stockpiling topsoil during construction.  The zoning application for phase 1B of the project stated that topsoil would be stripped and stockpiled for reuse on the project, and specified earth moving (both cutting and filling) that would occur as part of the site work on the project.  The erosion control specifications approved in 1996 as part of the approved plan for phase 1B, required the contractor to A[s]eed and mulch stockpile material as soon as possible to prevent soil erosion and sedimentation off-site.@

Construction of the entire VNCC project was expected to occur over a number of years.  Construction of the golf course itself required earth moving to create the flat areas and contoured areas constituting the fairways, greens, and surrounding areas of the golf holes, including permanent raised shaped berms of earth materials separating the golf course from the yards of some houses in the adjacent residential areas.

In the Southeast Quadrant zoning district, a wide >Restricted Area= has been created on both sides of Dorset Street as an Open Space/Scenic Corridor, and a narrower 250-foot-wide >Restricted Area= has been created along the south side of Swift Street.  All of the mounds of earth materials at issue in the present cases are located within the Restricted Area.  Under the Zoning Regulations, with certain exceptions, development activities are generally prohibited within the restricted areas, unless specifically approved by the DRB.  In particular, Section 6.501(a)   of the Zoning

Regulations allows within the restricted areas Aconstruction of access driveways, roads, and appurtenant improvements to serve approved development or uses.@  In connection with approval of a Planned Residential Development, '6.602 allows other development activities to occur and allows portions of residential lots to be located in restricted areas only if the DRB determines that the activities Aare consistent with the intent and purpose of the Southeast Quadrant@ zoning district.

During construction of the golf course and residential projects as of the date of trial, the various developers placed mounds of earth materials in approximately twenty-five different locations on VNCC property for later use in VNCC developments, some within and some beyond the Restricted Area pertaining to the Southeast Quadrant zoning district. Materials were removed as construction progressed, so that most of these mounds of earth materials disappeared as the materials were used in the course of construction of the golf course and residential projects.  Even if these mounds of earth materials were seeded and mulched to protect them during winter conditions, most of them were drawn from again in successive construction seasons.  Only a few of these mounds of earth materials were shaped into large mounds, seeded, and left unchanged for several years.  No notices of violation were issued and no permits were required for mounds of earth materials other than those at issue in the present proceedings.

We address in turn the violations alleged regarding the Dorset Street mounds of

earth materials, the violations alleged regarding the Economou Farm Road mounds of earth materials, the application for the Economou Farm Road berms, and the violations alleged regarding the clubhouse.

<u>Enforcement related to Dorset Street mounds of earth materials</u>

As of December 12, 2001, the most recent final plan amendment for the PRD for the eastern side of Dorset Street, covering Residential Parcel 3, Golf Course Parcel C, and Golf Course Parcel D, was the one issued on March 9, 1999.  It required subsequent approval of any amendments to the approved plans.  The plan did not change the then-existing grades shown on Residential Parcel 3, on Golf Course Parcel C, or on Golf Course Parcel D immediately south of Residential Parcel 3.  The grade is shown as relatively flat, with any change in grade being gradual or gentle.

As of December 12, 2001, the most recent final plan amendment for the PRD for the western side of Dorset Street near Nowland Farm Road, covering the Old Schoolhouse Parcel, was the one issued on March 21, 2000.  It required subsequent approval of any amendments to the approved plans.  The plan did not change the then-existing grades shown on the Old Schoolhouse Parcel.  The grade is shown as gently rolling.

Some time in the summer and fall of 2000, JAM Golf commenced the placement of or allowed others to place  large mounds of more than 20 cubic yards of earth materials on Golf Course Parcel C immediately south of the intersection of Holbrook Road with

Dorset Street and north of the intersection of Old Cross Road with Dorset Street.  Some time in the spring of 2001, Highlands and JAM Golf commenced the placement of or allowed others to place large mounds of more than 20 cubic yards of earth materials on Residential Parcel 3 and on Golf Course Parcel D immediately south of Residential Parcel 3.

Some time in the spring of 2000, Highlands commenced the placement of or allowed others to place large amounts of earth materials on the Old Schoolhouse Parcel, near Dorset Street, creating a large mound of more than 20 cubic yards of earth materials close to Dorset Street, and two smaller mounds of more than 20 cubic yards of earth materials farther from Dorset Street.

On or about December 12, 2001, the Administrative Officer issued two identical notices of violation, one addressed to JAM Golf, LLC and one addressed to Highlands Development Co., LLC.  Both were sent by certified mail to P.O. Box 132, Lyndon Center, Vermont 05850-0132.  The return receipt for the JAM Golf notice shows that it was delivered on December 13, 2001.  The notices contained the identifier: ARe: Zoning Violation B 1227 & 1230 Dorset Street@ as the only description of the property, and stated:

> Please be advised that based on information available to the City, you have commenced land development on your property at the above address without obtaining a permit . . . .  Specifically, you have initiated the following activities on

<u>the above-described property</u>.

Placed fill in excess of 20 cubic yards to construct berms along Dorset Street.

You have seven (7) days from the date of this letter to discontinue this violation and take appropriate remedial action. Specifically, you must accomplish the following:

Discontinue the violation by removing all fill or obtain an amended PRD approval and a zoning permit for the fill. (Emphasis added).

At the time of issuing this Notice of Violation, the Administrative Officer intended the notices to refer to the mounds of earth on Residential Parcel 3 and on Golf Course Parcel D immediately south of Residential Parcel 3, and on the Old Schoolhouse parcel.

Soon after issuing this Notice of Violation, in early 2002 the Administrative Officer realized that similar mounds of earth also existed on Golf Course Parcel C. He did not issue an additional Notice of Violation, on the basis that the description of the violations in the December 2001 Notice of Violation covered Golf Course Parcel C to the same extent that it covered Residential Parcel 3, Golf Course Parcel D immediately south of Residential Parcel 3, and the Old Schoolhouse parcel.

On or about March 22, 2002, October 22, 2002, and June 19, 2003, Highlands applied for sketch plan approval for Residential Parcel 3, including applications for

berms[3] between Dorset Street and the residential units, different in design from the existing mounds of earth materials, to provide visual screening and sound attenuation between the residences and Dorset Street. The earth materials located in the mounds of earth materials on Residential Parcel 3 and on Golf Course Parcel D immediately south of Residential Parcel 3 are proposed to be used in part to construct the proposed berms.

---

[3] Even if these berms have been or will be approved, and even if the City now supports the concept of the use of berms for these purposes within the restricted areas along Dorset Street, that fact would affect the prospective remedy or possible monetary penalty, not whether the mounds of earth materials were a violation at the time of the Notice of Violation.

On or about April 10, 2003, Highlands and another company (Wedgewood Development Company) applied for preliminary plat approval for the Old Schoolhouse Parcel, including an application for berms[4] between Dorset Street and the residential units, different in design from the existing mounds of earth materials, to provide visual screening and sound attenuation between the residences and Dorset Street. The earth materials now located in the mounds on the Old Schoolhouse parcel are proposed to be used in part to construct the proposed berms.

As of the time of trial, Residential Parcel 3 was permitted for four residential lots; no roadways or buildings have yet been constructed on it, although it may contain some underground utilities relating to the development as a whole. The mound of earth materials contained approximately 4,000 cubic yards of earth materials, was regular in appearance, had been seeded and mulched, and had not been drawn from as a stockpile since well before the issuance of the Notice of Violation.

As of the time of trial, the Old Schoolhouse Road neighborhood parcel was permitted for eleven units and had received preliminary approval to increase that number to fifteen units. It contained underground utilities relating to the development as a whole, but no roads or houses had yet been constructed on it. The large mound of earth materials contained approximately 10,000 cubic yards of material, was regular in

---

[4] See footnote 3, above.

appearance, had been seeded and mulched, and had not been drawn from as a stockpile since well before the issuance of the Notice of Violation. One of the two smaller mounds of earth materials contained approximately 1,500 cubic yards of gravel and the other contained less than a thousand cubic yards of topsoil and other separated materials; the City does not dispute that the two smaller mounds are stockpiles that are not sought to be removed and are not the subject of any request for penalties in the enforcement action.

The parties do not dispute that the placement of earth materials as fill to create permanent earth forms or >berms= as part of the landscaping or site work on a parcel requires a permit. Nor do the parties dispute that active stockpiles of earth materials, to which materials are added and from which materials are removed on an ongoing basis during a construction project, do not require a permit under '25.117.

The problem posed by the present cases arises during a large project of many years= duration, when a mound of earth materials is created within the Restricted Area from earth materials removed from one portion of a project, but is essentially set aside in reserve to be used for the same or another portion of the project many years later. The Zoning Regulations do not define the concepts of berms and stockpiles, do not distinguish between them as permanent berms or temporary stockpiles, and do not contain any objective measure of duration or intent to distinguish between them. Although this was the

conceptual distinction applied as a rule of thumb by the zoning Administrative Officer in determining which mounds of earth materials he considered to be a violation, because no applications had then been filed for approval of permanent berms in those locations, the Court must apply the Zoning Regulations as they are written. Under the present Zoning Regulations, the placement of mounds of earth materials in the restricted areas may require approval of the DRB under either or both of two ordinance sections: '25.117 and '6.602.

Under '25.117, DRB approval is necessary for the placing of twenty cubic yards (or more) of fill, gravel, sand, loam, topsoil or other similar material on land, Aexcept when incidental to or in connection with the construction of a structure on the same lot.@ For any mounds of earth materials outside of the Restricted Area, we would need to analyze whether the particular mound was placed in connection with the construction of a structure, and would need to analyze what constituted Athe same lot@ for the purposes of this section. However, mounds of earth materials placed within the Restricted Area must also qualify for approval under the regulation sections applicable to the Restricted Area in the Southeast Quadrant zoning district.

Under '6.501 of the Zoning Regulations, no Aland development activities@ are allowed in the restricted area except for the listed exceptions. The activities listed as exceptions do not include the placement of either permanent berms or temporary

stockpiles. Of the listed activities, Defendant-Appellants argue that subsection (a) is applicable; it allows Aconstruction of access driveways, roads, and appurtenant improvements@ to serve approved developments. However, the exception in subsection (a) does not apply, because neither permanent berms nor temporary stockpiles are Aappurtenant@ to the construction of driveways or roads. They may be improvements that are Aappurtenant@ to the residential development or to the golf hole that they surround, protect or buffer, but not to the access driveways or roads for the approved development.

Nevertheless, land development activities within the restricted area that do not fall within the '6.501 exceptions may be allowed by the DRB if it determines under '6.602 that Asuch development activities@ are consistent with the intent and purpose of the Southeast Quadrant zoning district. Thus, the DRB can allow either permanent berms or temporary stockpiles to be placed within the restricted area, but as the Zoning Regulations are now written,[5] an applicant must obtain DRB approval for each such activity. Under the regulations in effect at the time of the Notices of Violation, therefore, the mounds of earth materials within the Restricted Areas violated the Zoning Regulations for failure to obtain '6.602 approval from the DRB.

_____

[5] Of course, the City is free to amend its regulations to define an exception for construction stockpiles.

However, in the present case, the Notices of Violation issued with respect to the mounds on both sides of Dorset Street were ineffective to support an enforcement action, either for removal of the mounds or for a monetary penalty.[6] As a preliminary matter, to the extent that they applied to land then owned by Highlands, there is no proof of receipt of the Notice of Violation addressed to Highlands. Even assuming, given the relationship between Highlands and JAM Golf, that Highlands= was received, their most important defect is that they are on their face inadequate to give the landowner Aa reasonable opportunity to know what is prohibited.@ Compare, <u>Secretary, Agency of Natural Resources v. Irish</u>, 169 Vt. 407, 411 (1999) (regarding adequacy of regulations to determine location of violation).

First, the Notices of Violation provide inadequate notice of the locations of the asserted violations, although it would not have been difficult to specify the locations of the specific mounds of earth materials on a reduced-size copy of the approved plans, or to describe them more fully as to the neighborhood or area designation (as done by the parties in this litigation), or even to denote them by parcel numbers on the then-current tax map. Instead, the Notices of Violation merely give two street addresses: 1227 Dorset Street (intended by the Administrative Officer to denote the lands on the westerly side of

---

[6] We note that, although the amended complaint requests both injunctive relief and penalties, the City=s post-trial memoranda only request a declaration of whether there were violations.

Dorset Street) and 1230 Dorset Street (intended by the Administrative Officer to denote the lands on the easterly side of Dorset Street).

1227 Dorset Street is the street address and mailing address for the golf course clubhouse and administrative building. The number 1227 appeared on the tax map as of the time of trial to refer to the golf course (JAM Golf) lands on the west side of Dorset Street. As of the time of the Notices of Violation, none of the mounds of earth materials claimed to be violations were located on this property.

The property then owned by Highlands and known as the Old Schoolhouse parcel did not have a mailing address or street address as of the time of the Notices of Violation or as of the time of trial. It appeared on the tax map as of the time of trial with the number 1265 (presumably referring to Dorset Street), preceded by a number for each individual lot

1230 Dorset Street was not a functional address for any of the parcels at issue on the east side of Dorset Street. Indeed, it was not an address at all, although it may have been possible to infer, from the fact that it was an even number, that it was intended to refer to the east side, as opposed to the odd-numbered west side, of Dorset Street.

Accordingly, although the placement of the mounds of earth materials within the Restricted Area on both sides of Dorset Street without approval of the DRB under '6.602 was a violation, the Notices of Violation do not support the present enforcement action.

The enforcement action as to the Dorset Street mounds of earth materials is therefore concluded in favor of Defendant-Appellants, without prejudice.

Enforcement and Application for Berms at Economou Farm Road

The Economou Farm Road neighborhood is located in the northwest corner of the entire VNCC development area, bounded on the north by Swift Street. The neighborhood was approved for development for a twelve duplexes and a single-family house, not all of which had been built as of the time of trial. A municipal recreation path runs along the northerly side of Swift Street to and beyond Dorset Street.

Existing vegetation extends along the westerly edge of the property and is to be preserved in the landscaping plan for the Economou Farm Road neighborhood. Existing vegetation extends from the northwest corner of the property approximately two hundred feet easterly along Swift Street and is also to be preserved in the landscaping plan for the Economou Farm Road neighborhood. This existing vegetation screens a stormwater pond approximately four feet in depth, created with shallow berms and excavation within the northwest corner of the property.

As of March 6, 2002, the most recent final plan amendment for the PRD for the Economou Farm Road parcel at Swift Street, was that issued on December 19, 2000. It required prior approval of any amendments to the approved plans. The plan did not change the then-existing contours shown on either side of Economou Farm Road between

the trees and Swift Street, which are very gradual on the property, and which increase in a roughly terraced manner to a higher elevation (off the property) at the intersection of Swift Street with Dorset Street.

During construction of the Economou Farm Road neighborhood, a mound of earth materials, amounting to a volume of approximately 2000 cubic yards, primarily large rocks suitable as landscaping features and shot rock suitable for riprap, has been placed to the west of Economou Farm Road, oriented parallel to Swift Street and located within the Restricted Area much closer to Swift Street than the line of trees approved for that area in the plans. As of the date of trial, this mound of rocks was not covered with earth, or shaped, seeded or mulched.  It has been added to and drawn from, including  for private landscaping use, and constitutes a stockpile as the City has been using the term.

During construction of the Economou Farm Road neighborhood, a large rectangular mound of earth materials amounting to a volume of approximately 8,000 to 10,000 cubic yards has been placed to the east of Economou Farm Road, oriented parallel to Swift Street and located within the Restricted Area much closer to Swift Street than the line of trees approved for that area in the plans.  This mound of earth materials has been shaped, seeded and mulched, and has remained in place without being drawn from for construction at least since the March 6, 2002, Notice of Violation.

Nevertheless, as both mounds or stockpiles are located within the Restricted Area

and do not fall within the exceptions in '6.601, as discussed above, their placement required approval of the DRB under '6.602. The lack of that approval is a violation.

The approved landscaping plan for the Economou Farm Road neighborhood shows a row of hardwood street trees to be planted approximately sixty feet apart along Swift Street from the west edge of Economou Farm Road to the eastern edge of the Economou Farm Road property, and also extending on both sides of Economou Farm Road into the development.

The approved landscaping plan for the Economou Farm Road neighborhood also shows a single row of Austrian pine or spruce trees, ten feet on center, to be planted within the front (Swift Street) set back approximately twenty to fifty feet from the building envelopes for the Economou Farm Road houses and approximately two hundred feet in from Swift Street, flanking Economou Farm Road. Seven trees were approved to be planted to the west of Economou Farm Road, softening the view of the westerly Economou Farm Road houses from Swift Street. Twenty trees were approved to be planted in an angled line to the east of Economou Farm Road, softening the view of the easterly Economou Farm Road houses from Swift Street. Although these lines of trees were approved to be planted within the 250-foot open space view corridor shown as a >restricted area= on the Southeast Quadrant Official Zoning Map, they are located relatively closer to the houses than to Swift Street, and are not in the foreground of the

view onto the property from Swift Street.  As Austrian pine trees keep their branches down to the ground, unless pruned, and can grow to a height of approximately forty feet, this line of trees would have the appearance of a wall of vegetation at maturity, unless otherwise pruned.

Bicyclists and pedestrians moving from west to east along Swift Street would not experience the line of trees as an obstruction of the view onto the property or the view of the golf course, even if the branches of the trees were left at ground level and the trees grew to a mature height, because of the location of the trees relatively close to the houses and about 200 feet from the street.

Defendant-Appellant Trustee proposes to substitute shaped berms as shown on Exhibit 36, closer to Swift Street than the approved lines of trees.  The berm to the west of Economou Farm Road would rise to a height of nine feet above the elevation of Swift Street at that location, as would the westerly end of the berm to the east of Economou Farm Road.  The easterly end of that berm would rise to a height of six feet above the elevation of Swift Street at that location, with a saddle between them at a height of three feet above the elevation of Swift Street.

The substitution of shaped earth forms, with or without rocky outcroppings,  in the approximate locations of the approved lines of trees, and shaped and planted to resemble or blend with the shaped earth forms of the golf course, may qualify for approval if they

can be designed in a suitable location, shape, and height. Such berms may be preferable to the approved line of trees in this instance. However, as designed, the proposed berms cannot be approved. They occupy too much of the foreground of the view of a pedestrian or bicyclist traveling along Swift Street; that is, they are located too close to Swift Street and are too high in relation to their proximity to Swift Street. They will appear as an obstructive earthworks feature, rather than appearing as a similar or compatible feature to the those found on the surrounding properties. Accordingly, the application must be denied, specifically without prejudice to its redesign for submittal to the DRB for approval.

 Clubhouse enforcement

In December of 1998 the Planning Commission approved JAM Golf=s final plat for the clubhouse complex, which requires subsequent approval for any changes to the approved plans. In 1999 or 2000, the City=s zoning Administrative Officer inspected the clubhouse complex to determine its eligibility for a Certificate of Occupancy, and found that, as constructed, the parking and landscaping in the clubhouse complex did not entirely comply with the approved plans. Various temporary certificates of occupancy were issued to allow the occupancy and use of the clubhouse complex, but a permanent Certificate of Occupancy was not issued due to discrepancies between the approved plan and the actual placement of the parking lot and landscaping.

In response to being notified of this fact, JAM Golf filed a plan seeking approval of

what it submitted as the as-built conditions, which was approved on January 16, 2001. Section 508 of the Subdivision Regulations provided that the (formerly Planning Commission, now DRB) approval expires automatically ninety days after a plan=s approval, unless it is recorded with the City Clerk. Section 508 also provides that endorsement of the DRB chair or clerk is required for approval. If the time expires, '508 provides that the application must be resubmitted for final plat approval. The 90-day period was to expire on April 16, 2001, a Monday.

JAM Golf=s engineer brought the recordable Mylar version of the final approved plat to the Administrative Office of the City to be signed and recorded on April 11 or 12; however, they were left in the office of a staff member who was absent from the office, and were not discovered by the Administrative Officer until too late to obtain the required signature and to submit the plans for recording by the deadline. Accordingly, the Administrative Officer immediately informed JAM Golf that the deadline had passed and that the plan would have to be re-submitted to the DRB for approval, before it could be recorded. JAM Golf did not re-submit plans to the DRB between April of 2001 and May of 2002, so that as of May 17, 2002, the last approved plans in place were the November 1998 plans. On or about May 17, 2002, the Administrative Officer issued a Notice of Violation, by certified mail, stating that JAM Golf had used and occupied the clubhouse complex without first having obtained a certificate of occupancy, and had

constructed the parking lots and access drives, and had installed the landscaping at the clubhouse complex without first obtaining the necessary approval. JAM Golf appealed this Notice of Violation to the DRB, which upheld it on July 16, 2002; JAM Golf=s appeal of the Notice of Violation is Docket No. 158-7-02 Vtec.

JAM Golf immediately submitted for approval another plan for the clubhouse complex, substantially the same as the previously approved (but not recorded) plan. The DRB approved this plan in September 2002, however, JAM Golf thereafter requested that it not be recorded because it did not accurately reflect the as-built conditions. Rather, on November 14, 2002, JAM Golf submitted a further revised plan that did accurately reflect the as-built conditions. It was approved by the DRB on January 21, 2003; the parties stipulate that the Certificate of Occupancy should have been issued that date as well. It was recorded within the required 90-day period.

This course of events did result in a violation, technically at least, from some time in April of 2001 to January 21, 2003. Mitigating factors relating to delay caused by City officials and delay due to the pendency of regulation revisions might justify a reduction in a monetary penalty for some of those periods; evidence as to those mitigating factors may be presented in the penalty phase of this enforcement action. As of January 21, 2003, the violation was cured.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the placement of mounds of earth materials within the Restricted Areas in the locations at issue in this litigation, without approval from the DRB under '6.602, constitutes a violation of the Zoning Regulations. As the Notices of Violation were insufficient to support the present enforcement action as to Dorset Street, the enforcement action is concluded in favor of Defendants as to those violations, without prejudice. The enforcement action is concluded in favor of the Town as to the clubhouse violation and as to the Economou Farm Road mounds of earth materials, in that there was a violation. We held a telephone conference on August 29, 2005, to schedule any additional evidentiary hearing regarding the appropriate monetary penalties and remedial orders, if any, regarding the violations, and to discuss whether mediation could assist the parties to resolve the remaining phase of the enforcement case, Docket No. 107-5-02. A scheduling order regarding that case is enclosed. The application for berms proposed to be placed on the Economou Farm Road parcel and to substitute for the two lines of trees in the approved landscaping, is DENIED without prejudice to submitting a redesigned application to the DRB for berms placed closer to the house sites and designed so as not to block the view by pedestrians and bicyclists onto the site and across the northeast corner of the site onto the adjacent property.

Dated at Berlin, Vermont, this 30th day of August, 2005.


_____

Merideth Wright

Environmental Judge